**Katherine A. THORSON, Plaintiff**

**v.**

**GEMININ, INCORPORATED, Defendant.**

**No. C95–2009.**

United States District Court, N.D. Iowa, Eastern Division.

Feb. 2, 1999.

---

Dale Lee Putnam, Decorah, IA, for Katherine A. Thorson.

Charles A. Blades, Blades Carmichael, Cedar Rapids, IA, Terence Fruth, Mary L. Knoblauch, Douglas Elsass, Fruth and Anthony, PA, Minneapolis, MN, for Gemini, Inc.

Barbara Eby Racine, Dept. of Labor, Washington, DC, for U.S. Dept. of Labor.

## ORDER

JARVEY, United States Magistrate Judge.

This matter comes before the court pursuant to trial on the merits conducted August 18 and 19, 1998. At trial, the plaintiff was represented by Dale Putnam. The defendant was represented by Terence Fruth and Douglas Elsass. The parties consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court finds in favor of the plaintiff and directs the clerk to enter judgment in the amount of $49,591.86 plus interest, costs and attorney fees.

### *NATURE OF THE ACTION*

The plaintiff brings this action pursuant to the Family and Medical Leave Act (FMLA) alleging that the termination of her employment on February 18, 1994,

violated the Act. By order dated March 9, 1998, on remand from the Eighth Circuit Court of Appeals, the Honorable Michael J. Melloy found as a matter of law that the defendant had violated the FMLA by terminating the plaintiff. A trial on the issue of damages was set and the parties then consented to exercise of jurisdiction by a United States Magistrate Judge.

At trial, the plaintiff sought compensation for lost back pay and benefits and front pay with benefits until the time of plaintiff's retirement. In addition, she seeks an award of liquidated damages. The parties stipulated that reinstatement should not be considered by the court and the court accepts that stipulation.

The defendant contends that the plaintiff failed to mitigate her damages when she voluntarily quit a number of jobs that she accepted between the fall of 1994 and the spring of 1998. In addition, the defendant contends that the plaintiff's unprotected absenteeism was so frequent that her employment would have legitimately been terminated shortly after the termination that violated the FMLA. The defendant resists an award of liquidated damages contending that it attempted to comply with the Family and Medical Leave Act and should not be penalized for its inability to predict that plaintiff's stomach condition would ultimately be covered under the Act. The court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

The plaintiff, Katherine A. Thorson Rindels, worked for the defendant, Gemini, Inc., from September of 1986 until February 18, 1994. Gemini manufactures molded plastic signage primarily for the exterior of retail stores. The plaintiff's job was to retrieve orders and ship them to the customers via UPS. She was 45 years old when her employment with Gemini was terminated.

Following the termination of her employment, plaintiff received unemployment compensation. She made the two applications for employment per week as required while receiving benefits but did not secure employment until her unemployment benefits ran out. After these benefits ran out, she secured three jobs fairly quickly. First, she worked as a cashier in a convenience store on weekends but did not like it. Apparently, she did not like handling money and learned that a convenience store clerk in a nearby town had been murdered.

Plaintiff was next employed at the Decorah Retirement Center as a dessert cook. She quickly quit that job after learning that she would be working every weekend. She claimed that such a schedule made it difficult to assist in caring for her father. She worked in the Decorah Retirement Center from December 19 until December 29, 1994.

Plaintiff was next employed in March 1995 when she worked for two weeks as a home health aid. She was assigned to take care of a five-year-old girl with an immune system deficiency. She quit that job because she did not believe she had enough medical training to care for the girl. Plaintiff then went to work on April 24, 1995, at HECO Products (a/k/a Harmony Enterprises) in Harmony, Minnesota. She worked there until December 1995 when she was laid off.

Plaintiff collected unemployed compensation until April 1996 when she found employment at a Subway sandwich restaurant. During this time, she also took a job at an egg processing plant which she quit because she found it distasteful to work at a job where she had to identify bad eggs. On August 14, 1996, she took a job at a Jack & Jill grocery store as a baking assistant. She worked there until January 3, 1997.

On January 6, 1997, she started working at Northern Engraving in Spring Grove, Minnesota. This employment was 18 miles from her home. It involved a manufacturing facility that made, among other things, dashboards for automobiles. Her commute of 18 miles was extended to 50 because she moved to Spring Valley,

Minnesota, in September of 1997 to be closer to her husband's new business. She worked at this job until March 13, 1998, when she quit. She stated that she quit because she did not like the long commute.

The plaintiff started new employment at a company called Halcon on March 16, 1998, but quit that employment on May 6, 1998. She only worked one week between May 1998 and the commencement of trial in August.

The defendant argues that the plaintiff failed to mitigate her damages by maintaining employment following the termination of her employment at Gemini. It also argues that the plaintiff's problem with absenteeism was so bad at Gemini and her subsequent employers that her employment would have been terminated properly for absenteeism some point after it was improperly terminated in violation of the Family and Medical Leave Act in February of 1994. In the words of James Weinel, Gemini's President and Owner, plaintiff "would have been terminated the following week, the following month, shortly. It was over."

There is some general support for this argument. Because of the small number of people in plaintiff's department, the urgency with which orders must be shipped,[1] and the company's philosophy about absenteeism, it is clear that Gemini placed great emphasis on attendance. An employee at Gemini gets a bonus only for perfect attendance. The minimum acceptable standard to receive a raise is a two percent absenteeism rate. An employee with a five percent absenteeism rate does not meet the company's expectations for retaining employment. The policy is a no-fault policy. An employee can miss work because of scheduled and earned vacation time, leaves of absence, and holidays. Beyond that, every single missed work day counts against the employee's attendance. A sick employee with a doctor's excuse is still charged with an absence and those days are considered in determining whether an employee is eligible for a raise or to retain employment. In the words of Mr. Weinel, "If people couldn't show up, why would you hire them? Why would you have them there? We all need to be at work."

[redacted] Still, as harsh as the policy sounds, Gemini values and cares about its employees. Even though it has hundreds of employees, it terminates only an average of one per year. No one else with plaintiff's longevity has ever been fired at Gemini. The next most senior employee ever to be terminated had three and a half years of experience at Gemini. In fact, plaintiff had been targeted earlier for termination due to absenteeism and the President, James Weinel, prohibited the termination. Thus, while the court acknowledges that plaintiff's absenteeism problem (at Gemini and later employers) was serious, plaintiff's longevity at Gemini, its willingness to work with her in the past, and the company's reluctance to fire employees leaves this court with the belief that defendant's position here is very speculative. Defendant has failed to prove this defense by the preponderance of the evidence.

[redacted] Gemini also argues that the plaintiff failed to mitigate her damages when she failed to secure alternative employment and quit other jobs without appropriate justification. It is true that the plaintiff failed to secure any employment in 1994 until her unemployment benefits ran out. However, she consistently applied for jobs throughout this period and had to inform these prospective employers that she had been terminated from Gemini due to her absenteeism. While it is suspicious that plaintiff was able to secure several jobs quite soon after her unemployment benefits ran out, this suspicion does not amount to the defendant meeting its burden of proof by a preponderance of the evidence that she intentionally failed to secure employment during that time.

1. The defendant's success in this industry is attributed to its ability to ship orders within a day or two from receipt.

Other behavior by the plaintiff does show a failure to mitigate damages. She quit working as a cashier at a convenience store only because she was not accustomed to handling money and because she had heard of a convenience store clerk being murdered. She quit her job at the Decorah Retirement Center due to the fact that she did not believe she would have to work every weekend but ultimately was scheduled to work every weekend. While she claimed that this made it diffi- cult to assist in caring for her father, she never stated why it made it difficult.

Naturally, the court has no hesitancy finding that the plaintiff appropriately mit- igated her damages while working for HECO between April and November of 1995 and does not fault the plaintiff for being laid off. Again, she secured no em- ployment for four months before com- mencing work with Sparboe (the egg in- spection facility), Subway, and Jack & Jill.

Plaintiff's most blatant failure to mitigate damages arose when she quit her employment with Northern Engraving. During her fourteen months at Northern Engraving, plaintiff's pay rose from $5.90 to $7.66, $1.70 per hour in raises and shift differentials. In the last four years at Gemini, her pay increased only $1.20 per hour. Still, plaintiff quit work at Northern Engraving due to the lengthy commute. However, the commute was occasioned by the plaintiff's decision to move 32 miles further from her work than she had lived in the past. She and her husband made this decision for economic reasons, to be closer to her husband's new business. Thus, the defendant cannot be charged with lost back pay resulting from plaintiff's dissatisfaction with her own decision to reside further from her employment.

As noted above, plaintiff's hourly wage at Northern Engraving was rising at a rate much faster than it had been at Gemi- ni. A comparison of the rates at which her wages increased at Northern Engraving with how they had previously increased at Gemini suggests that within a year follow- ing trial, the plaintiff would have been earning a comparable salary and benefit package at Northern as she was with Gem- ini.

In the parties' helpful stipulation (Plain- tiff's Exhibit 1), they agree to the facts which establish that plaintiff would have earned $75,403.20 between February 18, 1994, and August 20, 1998, had she re- mained employed at Gemini. The parties also agree that the plaintiff actually earned $32,240.01 during that period of time. Plaintiff requests $43,163.19 in back pay.

Plaintiff's compensatory damages, lost benefits, and front pay award can be sum- marized as follows:

| AMOUNT | DESCRIPTION |
|---|---|
| $75,403.20 | Wages plaintiff would have made if retained at Gemini until trial |
| -32,240.20 | Wages earned by plaintiff February 18, 1994 - August 20, 1998 |
| 43,163.00 | Plaintiff's back pay demand |
| -4,289.60 | Reduction for time plaintiff should still have been employed at Northern Engraving May 6, 1998 - August 20, 1998 (14 weeks X $7.66/hour X 40 hours/week) |
| -2,000.00 | Reduction for time plaintiff should have remained at Decorah Retirement Center Dec. 30, 1994 - March 10, 1995 (10 weeks X 40 hours/week X $5/hour) |
| 36,873.40 | Total Back Pay Award |
| +1,996.80 | Front pay 2080 hours X $.96 ($8.62 - 7.66 = $.96) |
| +8,318.75 | Lost Profit Sharing Benefits |
| +2,402.91 | Lost Medical Benefits |
| $49,591.86 | Total Damage Award |

### Liquidated Damages

The Family and Medical Leave Act of 1993 became effective on August 5, 1993, for most employers and on February 5, 1994, for employers with a collective bargaining agreement in force. The President of Gemini, Mr. Weinel, learned of the passage of the Family and Medical Leave Act through a publication of an employer's association to which Gemini belongs. He learned that it included provisions for maternal and paternal leave but did not believe that those sections would have a significant impact on Gemini's operations as employees could already request and receive a leave of absence, in advance, for such events. The company personnel manual was due to be rewritten in February of 1994 and the company included a Family and Medical Leave Act provision in the rewritten manual. Information about the Family and Medical Leave Act was published in the company newsletter.

Mr. Weinel attempted to get copies of the Department of Labor regulations but found that they were not readily available.

Still, he believed that Kathy Thorson's situation did not implicate the Family and Medical Leave Act as she had not given birth and did not have a "major illness." He believed that the serious health conditions contemplated under the act included heart attacks, cancer, brain tumors, and the like. His information was that the plaintiff had an upset stomach. Because Gemini believed that plaintiff's gastritis did not rise to the level of a serious health condition, it did not consult doctors or lawyers about the decision to terminate plaintiff's employment.

Had Gemini been able to secure a copy of the Department of Labor regulations, it would have learned what Judge Melloy set forth in his July 24, 1996, order in this case which stated that

> Ordinarily, unless complications arise, the common cold, the flu, earaches, upset stomach, minor ulcers, headaches ..., etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave. 29 C.F.R. § 825.114(c).

Similarly, the legislative history behind the Family and Medical Leave Act is replete with references to examples of serious health conditions including heart attacks, most cancers, back and other conditions requiring therapy, strokes, secondary conditions which accompany certain disabilities, appendicitis, pneumonia, nervous disorders, and injuries caused by accidents on and off the job. The legislative history also refers to leave to care for a parent or spouse impaired by such conditions as Alzheimer's disease, stroke or clinical depression, recovery from a major surgery, or who is in the final stages of a terminal illness.

This court believes that liquidated damages are not appropriate as Gemini had a good faith belief that the provisions of the Family and Medical Leave Act did not apply, accompanied by an honest intention to learn and follow the law. Gemini's belief was objectively reasonable because of its effort to understand the law and because the regulations, as cited by Judge Melloy, made it appear as though plaintiff's condition was not a "serious health condition." It was years after the plaintiff's employment was terminated and during the pendency of the appeal when Department of Labor issued an opinion letter discussing the examples of serious health conditions relied upon by Judge Melloy. It was only then that a reasonable person should believe that plaintiff's condition was protected. With respect to the objective component of the defendant's burden to avoid liquidated damages, it is difficult to say that Gemini's belief was objectively unreasonable when the available authority then in existence caused even the court to reasonably conclude that the plaintiff was not entitled to protection under the FMLA.

### CONCLUSIONS OF LAW

The defendant's liability under the Family and Medical Leave Act of 1993 was established as a matter of law by the March 9, 1998, order of the Honorable Michael J. Melloy. Accordingly, trial in this matter was limited to the issue of damages. Under the Family and Medical Leave Act:

> Any employer who violates section 2615 of this title shall be liable to any eligible employee affected—
>
> (A) for damages equal to—
>
> (i) the amount of—
>
> (I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or
>
> (II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to the sum equal to 12 weeks of wages or salary for the employee;
>
> (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and
>
> (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission as not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and
>
> (B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

29 U.S.C. § 2617(a)(1).

With respect to the issue of back pay, the parties agree generally as to how back pay should be calculated. They disagree

about the degree to which plaintiff has mitigated her damages and whether the plaintiff's employment would have been terminated at some other date after February of 1994, but for the violation of the Family and Medical Leave Act.

### Duty To Mitigate Damages

■■■ Once unlawful discrimination has been found, back pay should usually be awarded in furtherance of the goal to make whole persons who suffer loss due to discrimination. *Parrish v. Immanuel Medical Center*, 92 F.3d 727 (8th Cir.1996). A successful employment discrimination plaintiff must show that she attempted to mitigate damages or face a reduction in the damage award. *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 502 (8th Cir. 1998). This duty requires that the plaintiff use reasonable diligence in finding suitable employment and not refuse a position substantially equivalent to the one that was lost. *Id.* Lack of mitigation is an affirmative defense that the employer bears the burden of proving. To do so, the employer must prove both that the claimant was not reasonably diligent in seeking other employment and that with the exercise of reasonable diligence there was a reasonable chance that the claimant might have found comparable employment. *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1581 (7th Cir.1997).

■■■ The duty to use reasonable diligence in finding suitable employment does not require the claimant to go into another line of work, accept a demotion or take a demeaning position. *Parrish, supra,* at 735. The requirement of mitigating damages is not onerous and does not require success. *Denesha, supra,* at 502. However, the plaintiff forfeits her right to back pay by refusing a job substantially equivalent to the one from which she was discharged. *Parrish, supra.* The plaintiff must make an "honest, good faith effort" to minimize her damages by obtaining full-time employment. Thus, the plaintiff must make some sustained minimal attempt to obtain comparable employment. She must

not abandon her efforts in the face of difficulty. *Denesha, supra.*

■■■ A claimant fails to mitigate damages by voluntarily quitting comparable interim employment for personal reasons. However, a voluntary quit does not toll the back pay period when it is motivated by unreasonable working conditions or an earnest search for better employment. *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir.1992).

The defendant proved by a preponderance of the evidence that plaintiff failed to mitigate her damages by voluntarily quitting her position as a dessert cook at the Decorah Retirement Center. For that reason, the court has deducted $2,000 representing the ten weeks that she should have remained at that position before working for Martin Luther Homes in March of 1995. More importantly, plaintiff voluntarily quit her position at Northern Engraving for personal reasons, namely a long commute. However, the long commute was created when the plaintiff voluntarily moved further from her place of employment to be closer to her husband's new business. Further, she made no effort to return to this employer when her next short term employment situation did not work out. The court does not fault the plaintiff for desiring a shorter commute or wanting to reside closer to her husband's business. The court simply finds that upon making these choices, the plaintiff cannot demand the wages that she could have earned at Northern Engraving.

### Liquidated Damages

The remedies provisions of the Family and Medical Leave Act were intended by Congress to mirror those of the Fair Labor Standards Act. It is therefore appropriate to rely on cases interpreting the liquidated damages remedy of the FLSA when interpreting the FMLA. *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 644 (6th Cir.1998).

■■■ Liquidated damages are considered compensatory rather than punitive

in nature. *Roy v. County of Lexington, South Carolina*, 141 F.3d 533, 548 (4th Cir.1998); *Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 71 (2d Cir.1997). They constitute compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages. *Id.* Doubling damages is not some disfavored penalty. Although they are discretionary rather than mandatory, there is a strong presumption in favor of doubling, a presumption overcome only by the employer's good faith and reasonable grounds for believing that the act or omission was not a violation of the Act. *Id.*

 In order to avoid liquidated damages, the employer bears a plain and substantial burden to persuade the court that the failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory [2] verdict. *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir.1997); *Shea v. Galaxie Lumber & Construction Co., Ltd.*, 152 F.3d 729, 733 (7th Cir.1998); *Reich, supra.* Doubling is the norm, not the exception. *Shea, supra*, at 733.

 Good faith requires more than a showing of ignorance of the prevailing law or uncertainty about its development. It is not enough to show that a violation was not purposeful. Nor is good faith demonstrated by the absence of complaints on the part of employees or conformity with industry-wide practice. Good faith requires that an employer first take active steps to ascertain the dictates of the law and then move to comply with them. *Reich, supra*, at 71.

 Several factors lead the court to the conclusion that an award of liquidated damages here is inappropriate. First, the Family and Medical Leave Act was only six months old at the time Gemini terminated the plaintiff. Second, Gemini made an active effort to learn the law and com-

ply with it. Third, Gemini's mistake about the law was only determined when the Secretary of Labor issued an advisory opinion during the pendency of plaintiff's appeal. Prior to that, the legislative history and the regulations provided solid support for Gemini's belief that the FMLA was designed to protect emergency and catastrophic "serious health conditions" and that minor ulcers and gastritis would not qualify as serious health conditions. Fourth, although Gemini did not seek a legal opinion concerning its liability, such opinion would not likely be more informed than that contained in Judge Melloy's opinion granting summary judgment to Gemini. For these reasons, the court rejects the plaintiff's claim for liquidated damages.

### Front Pay

 As with back pay, the purpose of front pay is to make a victim of discrimination whole and restore her to the economic position she would have occupied but for the unlawful conduct of her employer. The plaintiff bears the initial burden of proving the essential data necessary to calculate a reasonably certain front pay award, including the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate. The defendant remains free to challenge the award's amount, length or interest rate or to establish as an affirmative defense that the plaintiff failed to mitigate damages. *Barbour v. Merrill*, 48 F.3d 1270, 1279 (D.C.Cir.1995). The determination of front pay should be made after considering all of the circumstances regarding the claimant's employment situation that are relevant to the issue of front pay. *Excel Corp. v. Bosley*, 165 F.3d 635(8th Cir.1999).

 In this case, the court has found as a matter of fact that the plaintiff would have reached a comparable position at Northern Engraving as she had at Gemini within one year following the completion of

---

**2.** The Fourth Circuit uses the word "compen- satory" here to refer to a make-whole remedy.

the trial. The court made this finding based on the relative speed with which her wage was increasing at Northern Engraving as compared to her wage increases at Gemini. Accordingly, the court calculated front pay by deducting her wage rate at Harmony from her anticipated wage rate from Gemini at the time of trial and extending these damages for a one-year period of time. The court did not discount this award due to the court's delay in deciding this matter. In essence, because of the delay, the front pay award is now more akin to a back pay award.

Upon the foregoing.

IT IS ORDERED

That the Clerk of Court for the Northern District of Iowa shall enter judgment in favor of the plaintiff and against the defendant in the sum of Forty–Nine Thousand, Five Hundred Ninety–One Dollars and eighty-six cents ($49,591.86). Plaintiff's claim for attorney fees shall be filed and served no later than fourteen (14) days after the entry of this judgment pursuant to *Fed.R.Civ.P.* 54(d)(2) and *Local Rule* 54.2(a). Costs shall be taxed to the defendant.